IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **CHRISTIAN DAIGRE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 14 C 1980 |
| v. | ) | |
| | ) | Judge Elaine E. Bucklo |
| **MEL DAVIS,** Chief of Police of the Village of Robbins, in his individual and official capacities, **TYRONE WARD,** Mayor of the Village of Robbins, in his individual and official capacities, **JAMES E. COFFEY, SR.,** Village of Robbins Trustee, in his individual and official capacities, **DAVID BRYANT,** Village of Robbins Trustee, in his individual and official capacities, **ILA DAVIS,** Village of Robbins Trustee, in her individual and official capacities, **LENNY JOHNSON,** Village of Robbins Trustee, in his individual and official capacities, **SHANTIEL SIMON,** Village of Robbins Trustee, in his individual and official capacities, **CHANEL KELLY,** Village of Robbins Trustee, in her individual and official capacities, **ERNESTINE BECK-FULGHAM,** Village of Robbins Administrator, in her individual and official capacities, and the **VILLAGE OF ROBBINS, ILLINOIS,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Magistrate Judge Finnegan |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Christian Daigre filed this lawsuit after being terminated from his position as a police officer with the Village of Robbins Police Department. He has sued the Village of Robbins, several current and former Village Trustees, former Chief of Police

Mel Davis, Mayor Tyrone Ward, and Village Administrator Ernestine Beck-Fulgham, alleging, among other things, that they violated his First Amendment right to free speech, subjected him to discriminatory treatment because of his race (Caucasian) without due process, conspired to deprive him of his constitutional rights, and retaliated against him in violation of Illinois state law.

Currently before the Court is Plaintiff's motion for sanctions for Defendants' failure to produce key evidence during discovery. Plaintiff argues that Defendants have engaged in "a pattern of delaying or completely disregarding discovery procedures and orders," and complains that he has had to "jump through hoops to obtain discovery [that is] clearly relevant." (Doc. 128, at 5, 8).[1] In Plaintiff's view, Defendants' discovery lapses are severe enough to justify the sanction of a default judgment. Alternatively, he seeks a court order requiring Defendants to stipulate to withholding a "crucial" report prepared by former Village Investigator Jason Eagan, submit to a forensic examination of all of their computers and servers for any and all information related to Plaintiff, and pay an award of attorney's fees and costs related to litigating this dispute. Defendants deny the allegations of misconduct and insist there have been no discovery lapses that justify sanctions. For the reasons set forth here, the Court recommends that the motion be denied.

## DISCUSSION

**A.    Standard of Review**

Under Federal Rule of Civil Procedure 37(c)(1), "a failure to disclose any information that is required to be disclosed under Rule 26(a) and (e)(1) can result in the

---

[1]    For ease of reference, unless otherwise specified, page numbers for all briefs and exhibits are drawn from the CM/ECF docket entries at the top of the filed document.

imposition of various sanctions, which are listed in Rule 37(b)(2)(A)-(C)." *Dotson v. Bravo*, 321 F.3d 663, 667 (7th Cir. 2003). An award of sanctions "should effectuate its three purposes: (1) ensuring the disobedient party does not benefit from non-compliance; (2) obtaining compliance with discovery orders; and (3) providing a general deterrent in the particular case and litigation in general." *Woods v. Chicago Transit Auth.*, No. 04 C 4124, 2006 WL 2460618, at *2 (N.D. Ill. Aug. 18, 2006). *See also Centagon, Inc. v. Board of Dirs. of 1212 Lake Shore Dr. Condo. Ass'n*, No. 00 C 1110, 2002 WL 356483, at *4 (N.D. Ill. Mar. 5, 2002) ("Rule 37 sanctions are intended, first and foremost, to try to ensure that the discovery process works properly and that legitimate discovery materials that are sought are produced, and second, to eliminate the trial prejudice that otherwise might result if a requesting party's legitimate discovery requests were disregarded.").

Because the sanction of default or dismissal is considered draconian, it is only appropriate where "the noncompliance is due to willfulness, bad faith, fault or gross negligence rather than inability to comply or mere oversight." *Woods*, 2006 WL 2460618, at *2 (citing *Marrocco v. General Motors Corp.*, 966 F.2d 220, 223-24 (7th Cir. 1992)). *See also In re Golant*, 239 F.3d 931, 936 (7th Cir. 2001). That is, "the level of 'fault' must reflect 'extraordinarily poor judgment,' 'gross negligence,' or 'a flagrant disregard' of the duty to 'preserve and monitor the condition of evidence which could be pivotal in a lawsuit.'" *Danis v. USN Comms., Inc.*, No. 98 C 7482, 2000 WL 1694325, at *34 (N.D. Ill. Oct. 20, 2000) (quoting *Marrocco*, 966 F.2d at 224).

**B. Analysis**

Plaintiff claims that sanctions are warranted in this case to address the following misconduct by Defendants: (1) they failed to produce a crucial report prepared by Jason Eagan, a former Investigator with the Village's Internal Affairs Division, until three months after the December 21, 2015 discovery close date even though it specifically mentioned Plaintiff; (2) they "forced" him to file three motions to compel and a motion for forensic examination in order to obtain documents; and (3) they lost or destroyed other documents Plaintiff believes would "favor" his case. The Court considers each in turn.

**1. Eagan Report**

Plaintiffs' primary argument in support of sanctions is Defendants' late production of the Eagan report. Some background is helpful.

**a. Factual Allegations**

**Plaintiff's Demotion in June 2013:** Plaintiff started working for the Village as a part-time police officer in 2008. Following the resignation of the Chief of Police in January 2013, Plaintiff assumed the position of Commander under Acting Chief Jerome Guinn. At the time, Plaintiff was the only Caucasian on the police force. In May 2013, Defendant Ward was elected the new Village Mayor. Plaintiff sought to be appointed the new Chief of Police but allegedly was not selected due to his race. Instead, the Mayor appointed Defendant Davis as Chief of Police on May 30, 2013.

According to Plaintiff, Davis began engaging in discriminatory treatment against him the next day, when Davis told him that he was fired because he was not "a good fit for the police department[,]" which Plaintiff understood to mean he was not a good fit because he was Caucasian. (Doc. 47 ¶ 24). When Plaintiff protested, Davis said he

would take another week to think about what he was going to do. In a second meeting on June 5, 2013, Davis allegedly told Plaintiff: "As a minority community, Robbins has no need for a white police commander. We need someone who represents the demographics of our community, not some rich white guy." Plaintiff claims that Davis then unlawfully demoted him from the rank of Commander to the rank of Detective on June 22, 2013, and said that if he complained, Davis would terminate him. (*Id.* at 7-8.).

**Plaintiff's Furniture Purchases in January and February 2013:** Defendants maintain that one of the reasons Davis demoted Plaintiff was because he "misused [public safety] grant money to purchase furniture" from Office Depot in January and February 2013. (Doc. 128-3, at 4; Doc. 130, at 2; Doc. 130-2). The parties dispute the circumstances surrounding the purchases, as well as what happened after the Village's Accounts Payable Manager, Sherry Thomas, informed Plaintiff on February 12, 2013 that the furniture was not in fact covered by the grant in question. (Doc. 130-4; Doc. 132, at 2-3). Defendants say that Plaintiff proceeded to make two additional unauthorized purchases on February 20, 2013, further obligating an already "financially-strapped Village to pay[] for furniture that was not necessary." (Doc. 130, at 3, 4; Doc. 130-5). Plaintiff claims that he resolved the entire matter with former Village Administrator Napoleon Haney and was "not in trouble" for what he and Haney agreed were "miscommunications" relating to the purchases. (Doc. 132, at 2-3; Doc. 130, at 3).

For purposes of this motion, the only relevant points are as follows: (1) Davis testified (and Beck-Fulgham confirmed) that once he became Chief on May 30, 2013, he started to investigate the January and February 2013 furniture purchases; and (2) Davis said he demoted Plaintiff on June 22, 2013 at least in part because of "the issues

5

with the grant and the furniture." (Doc. 128-3, at 4, Interrogatory 6; Doc. 130, at 3, 4; Doc. 132, at 3; Doc. 130-7, at 2-5, 8, Davis Dep., at 86-88, 98, 282).

**Internal Investigation of Furniture Purchases Made in July 2013:** Shortly after Plaintiff's demotion, on July 9, 2013, an unknown individual or individuals ordered furniture and other items from Office Depot without Village authorization. (Doc. 128-1, at 4). Davis asked Village Investigator Eagan to investigate that "fraudulent activity" and issue conclusions and recommendations. (*Id.*). After speaking with two detectives and various Office Depot personnel on July 16 and 26, 2013, Eagan learned from Davis that additional unauthorized orders had been placed on July 30, 2013. (*Id.* 4-5). At that point, Eagan conducted an "informal interview" with Plaintiff and compared the invoices from Plaintiff's January and February purchases with those placed on July 9, 2013. (*Id.* at 5).[2] The items were nearly identical but Plaintiff stated he "would be willing to take a polygraph to show that he had nothing to do with" the July purchases. (*Id.* at 5-6). He also advised Eagan that "he thought that Michael Brown [a former Village officer] was behind this because he [Plaintiff] turned Michael Brown in for investigation by The Cook County Public Integrity Unit for missing personnel files involving complaints alleged against him [Brown]." (*Id.* at 6).

In his August 1, 2013 report, Eagan recounted his conversation with Plaintiff and referenced the "previous incident where furniture was ordered for the department" in early 2013, which he said "turned into a finger pointing match of who was responsible." (*Id.* at 7). Though Eagan "was not asked to investigate that incident," he believed it

---

[2] Eagan testified at his deposition that he knew about Plaintiff's furniture purchases because he was present when Sherry Thomas (on speakerphone) informed Plaintiff and former Chief Jerome Guinn that those purchases were not covered by the public safety grant. (Doc. 130-8, at 2-3, Eagan Dep., at 62-63).

"does lend some light into why someone would continually order the same furniture over and over." (*Id.*). In that regard, Eagan concluded that the July 2013 Office Depot purchases were

> apparently retaliatory in nature. Similar in nature to a scorned lover, it seems to be meant to keep a wound open or reopen one. Given the microscope that Det. Daigre was under in the previous incident, it would make no sense for him to order more furniture knowing that he would be the first to be looked at and it would jeopardize his employment.

(*Id.*). Eagan suspected that Brown was responsible.

In his report, Eagan recommended a variety of actions, including audits of "the village computers used by Det. Daigre, Sherry Thomas[,] the computer previously used by Napolean [sic] Haney,"[3] and "the computers used by Michael Brown in The Internal Affairs Office upstairs and in the evidence room." (*Id.* at 8-9). It appears that the unauthorized purchases stopped at that point, however, and Davis never took any of the actions Eagan recommended or discussed the matter with him again.[4] (Doc. 130, at 5; Doc. 130-8, at 5, Eagan Dep., at 69).

Plaintiff was never accused of these Office Depot furniture purchases from July 2013 in any of the letters and memos discussing the reasons for the adverse employment actions taken against him. (*See* Doc. 108-8; Doc. 108-11; Doc. 145-2; Doc. 145-4; Doc. 145-5; Doc. 145-6). And when Captain Smith verbally suspended Plaintiff on September 23, 2013 (at the direction of Chief Davis), Smith said the suspension was for the Office Depot purchases in early 2013. (Doc. 145-11, at 11). That same day, Plaintiff sent a memo challenging the suspension in which he said the purchases in violation of the grant stemmed from a miscommunication, and offered to

---

3 Haney left the Village around the time Defendant Ward was elected Mayor in May 2013.
4 Davis ceased serving as Chief of Police at the end of November 2013.

7

"partake in a plan that alleviates the [Village's] debt" resulting from the purchases. (*Id.* at 13).[5]

**Eagan's Deposition and Disclosure of August 2013 Report:** When Plaintiff's counsel deposed Eagan on March 9, 2016, she and defense counsel learned for the first time about Eagan's written report. (Doc. 128, at 3; Doc. 128-1, at 1). Eagan testified that after completing it, he gave a hard copy of the report to Davis, placed another copy in the Internal Affairs Division office, and saved an electronic version on his office computer. (*Id.* at 3-4; Doc. 128-1). Based on that testimony and Plaintiff's request for the report, Defendants searched Eagan's former Village computer, found the report on the hard drive, and produced a copy to Plaintiff on March 24, 2016. (Doc. 128-1, at 1; Doc. 130, at 7). Defendants also produced a copy of the document's "Properties" screen showing that the report was created on July 31, 2013, modified on August 1, 2013, and then accessed on March 23, 2016. (Doc. 130-11).

      **b.**      **Scope of Plaintiff's Document Requests**

Before turning to the substance of Plaintiff's argument, the Court first considers whether his discovery requests fairly encompass the Eagan report. Under Federal Rule of Civil Procedure 34, a requesting party "must describe with reasonable particularity each item or category of items to be inspected." FED. R. CIV. P. 34(b)(1)(A). Plaintiff claims that the report was responsive to several document requests found in his first and second sets of requests to produce. In the first set served on June 27, 2014, Plaintiff requested:

---

[5]     In this lawsuit, Plaintiff alleges that the real reason for the suspension that day was that he gave Chief Davis a memo on September 20, 2013 demanding that Davis rescind a prior order (to release a suspect—a relative of the Mayor's—without charging him) or Plaintiff would inform the Cook County Public Integrity Unit that Davis had committed official misconduct.

>    1. All documents originated and/or written by Defendants or employees which related to facts upon which the action is based.
>
>    5. All documents relating to the employment of Christian Daigre including but not limited to documents contained in Plaintiff's personnel file.
>
>    12. All documents that relate to the reason(s) Plaintiff was suspended.
>
>    17. All documents that relate to any alleged misconduct by Plaintiff while employed with the Village of Robbins, including but not limited to arrest reports, supplemental reports, booking documents, statements, and sworn testimony.

(Doc. 128, at 4; Doc. 128-4, at 5, 6, 8). In the second set served on December 9, 2014, Plaintiff requested:

>    10. Produce any and all documents in your possession that mention, make reference to, is regarding, or is about Plaintiff Christian Daigre from January 1, 2013 to the present.
>
>    13. All documents including e-mails relating to any investigation of the purchase of the Office Depot furniture.

(Doc. 128, at 5; Doc. 128-5, at 7).

Some of these requests are extremely broad, seeking all documents that mention or relate to Plaintiff and this lawsuit generally. Such "catch-all" requests are common in civil cases, but parties usually supplement them with much more tailored requests that focus on specific issues. *See F.D.I.C. v. Wachovia Ins. Servs., Inc.*, 241 F.R.D. 104, 108-09 (D. Conn. 2007) (expressing "disfavor" for "catch-all" discovery requests which are "often virtually impossible to comply with."). Here, none of the requests mentions Eagan in particular even though Plaintiff certainly knew that Eagan had questioned him about furniture purchases in July 2013, and even identified him as a potential witness in his Rule 26(a) disclosures. (Doc. 156-1, at 4).

9

Nevertheless, Plaintiff did ask for documents relating to *any* investigation of the purchase of Office Depot furniture by Plaintiff. Eagan admittedly was not conducting an investigation of Plaintiff's furniture purchases in January-February 2013, but since he interviewed Plaintiff about those purchases as background and summarized the interview in his report, the report is responsive to this request. In addition, the Eagan report is responsive to the separate broad request for any documents that mentioned or referenced Plaintiff in 2013. In sum, Plaintiff's document requests sufficiently covered the Eagan report that it should have been produced.

### c. Plaintiff's Arguments for Sanctions

Plaintiff contends that Defendants' late production of Eagan's report is evidence of bad faith given that they easily located it on "the Village's computers" after Eagan testified he saved a copy there. (Doc. 128, at 5-6). In Plaintiff's view, it "boggles the mind that this critical report had not been produced during discovery when Defendants represented to this Court on numerous occasions that documents relating to the Plaintiff had previously been searched for on Village's computers and produced by the Defendants." (Doc. 128, at 6).

The flaw in this argument is that Defendants never claimed to have searched Eagan's former computer, which is the only device on which they located a copy of his report. (Doc. 130, at 8). Nor did they claim to have searched any other devices not specifically identified in correspondence that defense counsel sent to Plaintiff's counsel in June 2015.[6] Moreover, though Plaintiff filed a motion for forensic examination in

---

[6] Defense counsel's June 3 and 12 letters clearly stated that the Village had searched its server, a detective's computer used by Plaintiff, and individual computers used by Palma James, Mayor Ward, Ernestine Beck-Fulgham, Sherry Thomas, Peggy Collier, Napoleon Haney, former Deputy Chief Hashi Jaco, and former Chief Davis. (Doc. 130-13; Doc. 130-14).

January 2016 identifying specific electronic devices he wanted searched, he said nothing about Eagan's former computer. Absent any evidence that Defendants were dishonest about which devices they searched, there is no basis for believing that they found but deliberately withheld the Eagan report or any other documents.

Plaintiff disagrees, arguing that Davis "certainly knew about the investigation" he himself requested and, at one point, had a hard copy of the associated report. Yet Davis "never made mention of the report nor was it produced in discovery" until Eagan revealed its existence during his deposition. (Doc. 128, at 7). Plaintiff insists that the report is clearly relevant to this case, stressing that Eagan "explicitly state[d] that he believes that Plaintiff was being retaliated against" (though the alleged retaliator was Michael Brown, a non-party to this lawsuit). (Doc. 132, at 4). Defendants respond that Plaintiff has greatly overstated the significance of the Eagan report. They note, for example, that Plaintiff's demotion for his furniture purchases occurred in June 2013, before Davis ever asked Eagan to investigate the new furniture purchases that were made in July 2013. (Doc. 130, at 4). Defendants also maintain that Davis never instructed Eagan to investigate Plaintiff in particular. (*Id.* at 5). Nor, they say, did Davis or any other Defendant use Eagan's report "as a reason to demote, suspend, or terminate the Plaintiff." (*Id.*). In that regard, Defendants' counsel represented during an April 28, 2016 hearing before this Court that Defendants will not be relying on that report as the basis for any adverse actions they took against Plaintiff. In other words, Defendants will not be arguing that Plaintiff is responsible for the Office Depot furniture purchases in July 2013. Nor could they realistically do so since there are numerous

---

Later, after overcoming some technical difficulties, Defendants also searched the Village Police Department servers.

11

letters and memos discussing the stated reasons for the adverse actions, and none includes the July 2013 furniture purchases.

It will ultimately be for a jury to determine the weight to give the Eagan report, if any. The only question here is whether Defendants should be sanctioned for failing to produce the report sooner. It is true that Davis did not mention the report to Plaintiff (or even, apparently, to his own counsel), but neither did Plaintiff question Davis about the underlying investigation that led to it. As noted, Plaintiff knew that Eagan had interviewed him in July 2013 about office furniture purchases that someone made that same month, and even posited who made the purchases and why (Officer Brown seeking to retaliate against Plaintiff). If these July 2013 furniture purchases, Eagan's investigation of them, and the resulting report were indeed crucial as Plaintiff claims, it is puzzling that he did not specifically request Eagan's interview notes or inquire about a possible report. During the April 28 hearing, Plaintiff's counsel represented that Eagan was named as a witness and ultimately deposed precisely because of his interview with Plaintiff.[7] Yet Plaintiff never pursued any related discovery or asked Davis or the other Defendants to answer deposition questions about that interview or how it came about. Under such circumstances, Plaintiff's claim of unfair prejudice from being unable to fully depose Defendants on these issues rings hollow.

In addition, Plaintiff made the decision to delay deposing Eagan until well after discovery closed in March 2016, and never spoke to him prior to that deposition. Plaintiff also did not notify Defendants that Eagan may have knowledge of the furniture purchases in particular, listing him instead as one of several people who may generally

---

[7] After defense counsel countered that she believed Eagan was relevant because he is another Caucasian officer who made a charge of discrimination against the Village, Plaintiff's counsel then cited that as the reason Plaintiff first placed Eagan on his witness list.

12

have knowledge about: "negative actions and comments" made by Ward and Village officials; "illegal and unethical compensation practices"; and "unlawful and unethical practices utilized by Davis, Ward, and Village officials to suspend and subsequently terminate" Plaintiff. (Doc. 156-1, at 4). Though Plaintiff identified Eagan as one of three people who also may have knowledge of an "internal investigation involving former Cpl./Lt. Michael Brown, whereby Michael Brown illegally removed internal affairs complaints filed against him (Michael Brown) from the evidence/property room when he (Michael Brown) was operating as Lieutenant for Internal Affairs," (*id.*), Plaintiff concedes that the referenced investigation "is separate from the internal affairs investigation/report" that forms the basis of this motion for sanctions. (Doc. 156, at 2).

As for the hard copy of the report Eagan said he gave to Davis, defense counsel represented at the April 28, 2016 hearing that Defendants had searched through all of the paper files and did not find it. This Court has no reason to doubt that representation. Plaintiff has not demonstrated that Defendants deliberately withheld the Eagan report or recklessly failed to conduct an appropriate search for it in hard copy or electronic format. Indeed, had Defendants deliberately withheld the report, they logically would not have produced the electronic version after Plaintiff specifically requested it following Eagan's deposition. Since Plaintiff now has the Eagan report in hand and has failed to demonstrate prejudice from the delay in production, this Court recommends that the request for sanctions on this basis be denied.

### 2. Motions to Compel and for Forensic Exam

Plaintiff next argues that Defendants should be sanctioned because their unwillingness to comply with discovery obligations "forced" him to file three motions to

compel and a motion for forensic examination. (Doc. 128, at 5; Docs. 40, 63, 100). This Court disagrees. Three motions to compel over the course of approximately 18 months of discovery is hardly evidence of any willful or reckless conduct on the part of Defendants, particularly since Defendants filed four motions to compel of their own during that same period. (Doc. 128, at 5; Docs. 17, 65, 104, 118). In addition, this Court denied Plaintiff's motion for forensic examination, finding the request unnecessary, untimely, unduly burdensome and not proportional to the needs of the case. (Doc. 152). Plaintiff's request for sanctions based on these motions should be denied as well.

### 3. Other Missing Evidence

Plaintiff finally argues that sanctions are necessary because Defendants have "failed to produce other critical documents relating to Plaintiff's termination," some of which he believes would "favor" his case. (Doc. 128, at 6, 8). Plaintiff does not specifically identify these documents so provides insufficient support for the Court to recommend sanctions. Assuming Plaintiff is relying on the same documents identified in support of his motion for a forensic examination, this Court's order denying that motion contains an extensive discussion of the documents. (Doc. 152). In that Order, the Court found that Defendants' failure to produce the documents did not justify an invasive examination of numerous Village computers, servers and other electronic devices. For the same reasons, the Court recommends that Plaintiff's similar request for a forensic examination of all Village computers and servers as a sanction for alleged discovery violations likewise be denied.

Plaintiff's only other basis for seeking sanctions is Defendants' recent revelation that a recording of a closed session board meeting on October 8, 2013 was "destroyed by water damage . . . approximately 18 months after the meeting had been recorded . . . and no other recordings had suffered 'water damage.'" (Doc. 128, at 6). Again, some background is helpful. Due to problems with the Village's recording system, Defendants say that Village Administrator Beck-Fulgham recorded the October 8 closed session meeting on her personal cellular telephone, a Samsung Galaxy Note 2. She says that after the meeting, she was unable to download the recording to "the Village of Robbins network computer or to any computer," so it remained solely on her personal phone for the next 18 months. (Doc. 141-4, at 1, Beck-Fulgham Aff. ¶¶ 3, 4).

On May 2, 2015, the day after her deposition in this case, Beck-Fulgham reportedly dropped her cellular phone in the toilet, rendering it "completely inoperable." (Doc. 141, at 3; Doc. 141-4, at 2, Beck-Fulgham Aff. ¶ 5). Beck-Fulgham allegedly purchased a new cellphone (a Samsung Galaxy Note 3) on May 4, 2015 and threw her old phone in the garbage. (Doc. 141-4, at 2, Beck-Fulgham Aff. ¶¶ 7, 8). According to Defendants, the only data from her old phone that had been backed-up were the contacts from her personal "Gmail" account. All other data, including the audio recording of the October 8, 2013 closed session meeting, were inaccessible. (*Id.*, Beck-Fulgham Aff. ¶¶ 5, 6).

Plaintiff believes that it is "highly probable the Defendants discussed [his] termination in the October 8, 2013 closed session meeting yet [he] is now denied the ability to confirm [h]is allegations that the Defendants unlawfully terminated his employment in violation of federal and state law." (Doc. 134 ¶ 11). Plaintiff also finds it

15

"inconceivable that Beck-Fulgham, an experienced Village Administrator who has earned multiple college degrees, would not have ensured the preservation of the audio recording." (*Id.* ¶ 12). Defendants, on the other hand, maintain that Plaintiff "was not discussed on October 8, 2013" at all, and insist that the damage to the phone was entirely "inadvertent." (Doc. 141, at 2, 6).

Once again, a jury will need to decide the significance of the missing October 8, 2013 recording, if any. For purposes of this motion, Plaintiff has not presented any evidence thus far that Beck-Fulgham or the other Defendants acted willfully, in bad faith, or with gross negligence in handling the recording as required for a default judgment. Nor does he seek any other sanction pertinent to this issue. This Court therefore recommends that the motion for sanctions be denied without prejudice. In making this recommendation, the Court notes that it granted Plaintiff's separate motion to re-depose Beck-Fulgham and Village Clerk Palma James, which may produce additional information regarding how the October 8, 2013 recording was maintained and the circumstances under which it became irreparably damaged. (Doc. 151).

## **CONCLUSION**

For the reasons stated above, the Court recommends that Plaintiff's Motion for Sanctions for Defendants' Failure to Produce Key Evidence During Discovery (Doc. 128) be denied. Pursuant to FED. R. CIV. P. 72(b), specific written objections to this Report and Recommendation may be served and filed within fourteen (14) days from the date that this order is served. Failure to file objections with the Honorable Elaine E. Bucklo within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the Report and Recommendation.

ENTER:

Dated: July 6, 2016

*Sheila Finnegan*

SHEILA FINNEGAN
United States Magistrate Judge